**IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

No. 17-41183

United States Court of Appeals
Fifth Circuit

**FILED**

December 27, 2019

Lyle W. Cayce
Clerk

MICHAEL ALAN PETZOLD,

　　　　Plaintiff–Appellant,

v.

MIKE ROSTOLLAN, Registered Nurse at Federal Correctional Institution
Texarkana; CHRISTOPHER WOODING, Correctional Lieutenant at Federal
Correctional Institution Texarkana; JOHN WILLIAMS, Correctional
Lieutenant at Federal Correctional Institution Texarkana,

　　　　Defendants–Appellees.

Appeal from the United States District Court
for the Eastern District of Texas

Before SOUTHWICK, WILLETT, and OLDHAM, Circuit Judges.

DON R. WILLETT, Circuit Judge:

　　　Michael Petzold, a diabetic federal prisoner, injured his ankle while
exercising. He sued various prison officials under *Bivens*, alleging they were
deliberately indifferent to his medical needs in violation of the Eighth
Amendment's Cruel and Unusual Punishment Clause. Petzold also lodged a
First Amendment claim, alleging retaliation for having filed grievances. The
district court granted summary judgment in favor of all Defendants,
concluding there was no genuine dispute of material fact. We agree and
AFFIRM.

No. 17-41183

I

One Friday in October 2013, Petzold injured his ankle.[1] He quickly iced it, but it swelled, and the pain became "excruciating."[2] On his walk to the daily insulin-dispensing line, Petzold told a correctional officer about his injury.[3] Petzold also claims that Mike Rostollan, a prison nurse, passed Petzold in the hallway and commented on his limp.[4]

Petzold waited in line for insulin. When it was his turn, he asked Rostollan, the dispensing nurse, to evaluate his ankle and render aid after the insulin line concluded.[5] Rostollan, without looking at Petzold's ankle, told Petzold to "purchase some" pain medication—though the commissary was

---

[1] The facts provided are undisputed unless otherwise noted. And disputed facts are presented in the light most favorable to Petzold, the non-movant. *See Hart v. O'Brien*, 127 F.3d 424, 432 n.1 (5th Cir. 1997), *abrogated on other grounds by Kalina v. Fletcher*, 522 U.S. 118 (1997).

[2] Before he injured his ankle, Petzold had filed multiple grievances aimed at changing the prison's insulin line. According to Petzold, his campaign was met with disapproval from the nursing staff, including prison nurse Mike Rostollan.

[3] Petzold alleges that this correctional officer told Rostollan about Petzold's injury and, in response, Rostollan had the officer tell Petzold to go to sick call on Monday. But Rostollan's official incident report denies that this interaction occurred. Petzold alleges that this incident report is false.

[4] Petzold further claims that nurse Rostollan "repeatedly engaged in the unprofessional mistreatment of inmates in the past. . . ."

[5] Per prison protocol, prisoners can only request medical aid through the insulin line for "clear medical emergencies." However, in a personal affidavit, Petzold asserts that he once saw Rostollan give another prisoner an Ace bandage in the insulin line. Even when no medical staff is on duty, prisoners can request medical attention—at any time, night or weekend—through the inmate's unit officer.

closed for the weekend— or "find some [pain medicine] on the unit,"[6] and "put some ice on it."[7]

Petzold says that after he left the line, prison supervisor Christopher Wooding confronted him, saying Rostollan had reported Petzold's "insolen[ce]" in the insulin line, and admonished that Petzold would be "locked up" in an administrative segregation unit if he caused "any more problems." Petzold alleges that, because of Rostollan's report, Wooding placed him in a "dry cell" (a cell with no plumbing) for two hours. Petzold also asserts that he showed Wooding his ankle, said he was diabetic and in pain, and requested further medical treatment. In response, Wooding allegedly exclaimed, "I don't care about your ankle" and told Petzold to report to sick call on Monday.

Over the weekend, Petzold "iced and elevated his ankle." Despite his efforts, he was in "the worst pain he had ever experienced."[8] On Monday, Petzold was effectively treated by another nurse; X-rays showed Petzold's ankle was slightly fractured.

Weeks later, Petzold filed a formal grievance against Rostollan. Special Investigation Supervisor John Williams interviewed Petzold. The next day, Williams placed Petzold in the Segregated Housing Unit due to safety

---

[6] Petzold alleges that "find[ing] some Motrin on the unit" is contrary to prison policy because prison guidelines prohibit "[p]ossession of anything not . . . issued to [the inmate] through regular channels." We agree.

[7] This account is supported by other prisoners' affidavits, but Defendants assert that Rostollan also told Petzold to elevate his ankle, which Petzold disputes. Rostollan's official report agreed with Petzold's assertions but also stated that their encounter was evaluative; because Petzold does not agree that the encounter was evaluative, he claims this report is false.

[8] Another prisoner's affidavit supports Petzold's recount that Petzold was in severe pain.

concerns.[9] While in the SHU, Petzold alleges that Rostollan saw Petzold in his segregated cell and told the SHU guard that Petzold should be treated adversely. Petzold remained in the SHU for 93 days. While there, Petzold filed another grievance, which included the statement that he "[didn't] want to remain locked up in [the SHU] for an extended period of time."

Petzold filed a sworn complaint in 2015 alleging two things—deliberate indifference (by Rostollan and Wooding) to his serious medical needs in violation of the Eight Amendment, and retaliation (by Rostollan and Williams) in violation of his First Amendment right to file grievances.[10] Defendants filed a motion to dismiss based on (1) Petzold's failure to state cognizable constitutional claims, (2) Petzold's failure to exhaust administrative remedies, and (3) Defendants' entitlement to qualified immunity. The magistrate judge relied on evidence outside the pleadings and properly treated the motion as one for summary judgment. He recommended granting it in its entirety.[11] The district court agreed and adopted the magistrate judge's findings, granted the defendant's motion, and dismissed Petzold's suit with prejudice.[12] Petzold appealed.

---

[9] Prisoners who file grievances are "routinely" placed in the SHU, also called administrative segregation, to protect the prisoner and the staff while the grievance is investigated.

[10] Although Petzold also alleged a due process violation, he does not pursue this claim on appeal.

[11] The magistrate judge's report and recommendations found that: (1) Rostollan was not deliberately indifferent to Petzold's medical needs because Rostollan did not ignore his complaint; (2) Petzold had not shown a plausible inference that Rostollan's actions were motivated by any retaliatory intent; (3) Petzold's retaliation claim against Williams was unexhausted; and (4) the defendants were entitled to qualified immunity. Because the court properly treated the Defendants' motion to dismiss as a motion for summary judgment, we refer to it as a motion for summary judgment.

[12] *See* 28 U.S.C. § 636.

No. 17-41183

II

The rules governing our consideration are well settled.

*First*, the standard of review. We review grants of summary judgment de novo, "using the same standard as that employed initially by the district court under Rule 56."[13]

*Second*, the summary-judgment standard. Under Rule 56, summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[14] There is no genuine issue for trial "[i]f the record, taken as a whole, could not lead a rational trier of fact to find for the non-moving party."[15] And while we review the evidence in the light most favorable to the nonmoving party, "conclusional allegations and unsubstantiated assertions may not be relied on as evidence by the nonmoving party."[16]

III

Almost a half-century ago, the Supreme Court in *Bivens* approved an implied damages remedy against federal officials who violate the Fourth Amendment's prohibition against unreasonable searches and seizures.[17] The Court later extended *Bivens* to Eighth Amendment claims of cruel and unusual punishment.[18] And while the Cruel and Unusual Punishment Clause prohibits

---

[13] *Kerstetter v. Pac. Sci. Co.*, 210 F.3d 431, 435 (5th Cir. 2000).

[14] FED. R. CIV. P. 56(a).

[15] *Kipps v. Caillier*, 197 F.3d 765, 768 (5th Cir. 1999).

[16] *Carnaby v. City of Houston*, 636 F.3d 183, 187 (5th Cir. 2011).

[17] *Bivens v. Six Unknown Named Agents of the Fed. Bureau of Narcotics*, 403 U.S. 388 (1971).

[18] *Carlson v. Green*, 446 U.S. 14, 17 (1980).

No. 17-41183

deliberate indifference to prisoners' medical needs,[19] it is unclear if the *Bivens* remedy extends to this context.[20] We need not decide this question today; instead we assume that *Bivens* reaches Petzold's Eighth Amendment claims of deliberate indifference and address the claims' merit.[21]

---

[19] *Estelle v. Gamble*, 429 U.S. 97, 104–05 (1976).

[20] *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1856–58 (2017).

[21] The Supreme Court has explicitly blessed, post-*Abbasi*, the assume-then-dispose approach we employ as "appropriate" for "many cases." *Hernandez v. Mesa*, 137 S. Ct. 2003, 2007 (2017) ("[D]isposing of a *Bivens* claim by resolving the constitutional question, while assuming the existence of a *Bivens* remedy[,] *is* appropriate in many cases." (emphasis added)). And this approach is certainly not *in*appropriate for Petzold's routine constitutional questions—he doesn't assert "sensitive" claims or ones with "far reaching" consequences. *Hernandez*, 137 S. Ct. at 2007 (finding assuming-then-disposing "imprudent" only in an extraordinary, "sensitive" context with "far reaching" constitutional consequences). Although relevant circuit caselaw is limited, district courts also follow the Court's mandate; they assume-then-dispose in "many" "appropriate" cases, just as we do today. *See, e.g.*, *Wallace v. Garibay*, No. EDCV 16–2046 MWF(SS), 2018 WL 6204583, at *5 n.9 (C.D. Cal. Sept. 14, 2018) (citation omitted); *Grossman v. United States*, No. 19–CV–9191 (NSR), 2019 WL 5887365, at *3 (S.D.N.Y. Nov. 8, 2019); *Carpio v. Chief Counsel*, *DHS-ICE*, No. EDCV172030DDPAGR, 2018 WL 5919474, at *4 (C.D. Cal. Aug. 8, 2018), *report and recommendation adopted*, No. EDCV172030DDPAGR, 2019 WL 1670940 (C.D. Cal. Apr. 16, 2019).

But if we were to address whether *Bivens* extends to this context in light of *Abbasi*, Petzold's deliberate-indifference claims based on denied medical treatment are likely a "new [*Bivens*] context" because they "differ in a meaningful way" from existing *Bivens* claims. *Abbasi¸* 137 S. Ct. at 1856–58, 1865 ("Given [the] Court's expressed caution about extending the *Bivens* remedy . . . the new-context inquiry is easily satisfied."); *Cantú v. Moody*, 933 F.3d 414, 422 (5th Cir. 2019) ("What if a plaintiff asserts a violation of the same clause of the same amendment *in the same way*? That still doesn't cut it."). Here, the federal officers involved were low-level, the specific actions distinct, and the alternative remedial process robust. *Abbasi*, 137 S. Ct. at 1859 ("A case might differ in a meaningful way because of [1] the rank of the officers involved . . . [3] the generality or specificity of the official action; . . . [7] the presence of potential special factors that previous *Bivens* cases did not consider."); *cf. Carlucci v. Chapa*, 884 F.3d 534, 538 (5th Cir. 2018) (assuming a *Bivens* remedy for a deliberate-indifference claim based on high-level prison officials failing to heed doctor's orders). And we are unlikely to imply a *Bivens* remedy for this new context as "special factors" counsel hesitation in federal prison administration. *Abbasi*, 137 S. Ct. at 1857–58 ("[T]he [special factors] inquiry [] concentrate[s] on whether the Judiciary is well suited . . . [to] weigh the costs and benefits of allowing a damages action . . . .").

No. 17-41183

But deliberate indifference is "an extremely high standard."[22] The prisoner "must first prove objective exposure to a substantial risk of serious harm"—in other words, the prisoner must prove a serious medical need.[23] Second, the prisoner must prove the officials' subjective knowledge of this substantial risk.[24] Third, the prisoner must prove that the officials, despite their actual knowledge of the substantial risk, denied or delayed the prisoner's medical treatment.[25] Finally, the prisoner must prove that the delay in or denial of medical treatment resulted in substantial harm, such as suffering additional pain.[26] Importantly, "disagreement about the recommended medical treatment is generally not sufficient to show deliberate indifference."[27]

Supervising officials are liable for their own deliberate indifference but are not vicariously liable for their subordinates' conduct.[28] A supervisor is deliberately indifferent if, with subjective knowledge of the substantial risk of serious harm, he or she fails to supervise a subordinate and this failure causes a prisoner's rights to be violated.[29]

---

[22] *Domino v. Tex. Dep't of Criminal Justice*, 239 F.3d 752, 756 (5th Cir. 2001).

[23] *Gobert v. Caldwell*, 463 F.3d 339, n.12, n.30 (5th Cir. 2006); *Carlucci*, 884 F.3d at 538 (showing implicitly that a "serious medical need" equates to an "objective exposure to substantial risk of serious harm").

[24] *Lawson v. Dallas Cty.*, 286 F.3d 257, 262 (5th Cir. 2002).

[25] *See Gobert*, 463 F.3d at 345–47 (recounting that negligent or unsuccessful medical treatment is not actionable); *Mendoza v. Lynaugh*, 989 F.2d 191, 195 (5th Cir. 1993).

[26] *Alderson v. Concordia Par. Corr. Facility*, 848 F.3d 415, 422–23 (5th Cir. 2017).

[27] *Carlucci*, 884 F.3d at 538.

[28] *Alderson*, 848 F.3d at 420; *Thompkins v. Belt*, 828 F.2d 298, 304 (5th Cir. 1987).

[29] *Goodman v. Harris Cty.*, 571 F.3d 388, 395 (5th Cir. 2009) (requiring a pattern of violations to establish deliberate indifference through the failure to supervise).

No. 17-41183

A

We start with Petzold's deliberate-indifference claim against Rostollan. The district court did not err in granting summary judgment. Even viewing the record favorably to Petzold, there is no genuine factual dispute underlying two necessary elements of his deliberate-indifference claim.[30] As Petzold does not produce evidence showing that Rostollan (1) had subjective knowledge of Petzold's exposure to harm, or (2) denied or delayed Petzold's medical treatment, summary judgment was proper.

First, there is no factual dispute whether Rostollan had subjective knowledge that Petzold fractured his ankle—he did not.[31] Rostollan's fleeting insulin-line and hallway encounters with Petzold were cursory. Rostollan never saw Petzold's swollen ankle, nor did he review Petzold's medical records.[32] The record shows that Rostollan only had personal knowledge of Petzold's ankle injury, limp, and diabetes. From this subjective knowledge, a

---

[30] Petzold does show factual disputes underlying two necessary elements of his deliberate-indifference claim. By producing undisputed evidence that he fractured his ankle that Friday, Petzold establishes that he was objectively exposed to a substantial risk of serious bodily harm for which treatment was clearly required—a serious medical need. *See Harris v. Hegmann*, 198 F.3d 153, 159 (5th Cir. 1999) (holding that a prisoner's broken jaw, although not certain to be broken until days later, met the objective requirement on the day it was broken). And by producing corroborated evidence that he was in pain over the weekend, Petzold shows a genuine factual dispute whether he suffered "substantial harm." *See Alderson*, 848 F.3d at 422–23. But Petzold fails to show factual disputes underlying the two additional, necessary elements of his deliberate-indifference claim.

[31] Petzold's substantial risk of bodily harm is his fractured ankle, not his limp. *Harris*, 198 F.3d at 159 (holding that a prisoner's broken jaw, not its damaged appearance, was the substantial risk of bodily harm)

[32] Though Petzold argues that Rostollan should have done both these things, this argument is irrelevant under deliberate indifference's subjective knowledge inquiry. Here, we only ask what Rostollan actually knew, not what he should have known. *Lawson*, 286 F.3d at 262. And, to the extent Petzold's argument has weight, we consider Rostollan's failure to perform a thorough evaluation as part of our inquiry into whether Rostollan denied or delayed treatment. *Domino*, 239 F.3d at 756.

reasonable jury could infer that Rostollan knew Petzold had a common ankle sprain because that is a typical concern stemming from an ankle injury and limp.[33] But no reasonable jury could find that Rostollan had actual knowledge of Petzold's fractured bone, an atypical injury, from his limited encounters and correspondingly truncated knowledge.[34]

Second, there is no genuine dispute of material fact as to whether Rostollan denied or delayed Petzold's medical treatment. Even accepting Petzold's recount of Rostollan's insulin-line statements—"ice" your ankle and "purchase some" pain medicine from the (closed) commissary or "find some" from other prisoners—a reasonable jury could not find that Rostollan denied or delayed medical treatment to Petzold.[35]

As a matter of law, Rostollan's instruction for Petzold to ice his ankle was medical treatment.[36] It was medical treatment because it was medical advice that Petzold could, and did, effectuate.[37] Petzold argues that the

---

[33] *See Gobert*, 463 F.3d at 349.

[34] *Cf. Lawson*, 286 F.3d at 262 (inferring subjective knowledge of serious ulcers from the nurses' frequent, first-hand observations of the ulcers); *Easter v. Powell*, 467 F.3d 459, 463 (5th Cir. 2006) (inferring subjective knowledge of a prisoner's severe chest pain from the official's knowledge of the prisoner's symptoms, his history of heart problems, and his full medical history); *Gobert*, 463 F.3d at 349 (inferring subjective knowledge of the risk of infection to an open wound from the official's first-hand knowledge of the wound and medical understanding of infection).

[35] Though there is a dispute over the exact instructions Rostollan provided Petzold in the insulin line, this dispute is not material because, even accepting Petzold's assertions as true, there was no denial or delay of medical treatment.

[36] We agree with Petzold that Rostollan's medication instructions were not medical treatment because they were impossible or illegal to effectuate. *Easter*, 467 F.3d at 463 (holding that medical treatment that is impossible to conduct is not medical treatment). But this finding is not dispositive because Rostollan's icing instruction was medical treatment.

[37] *Easter*, 467 F.3d at 463; *Lawson*, 286 F.3d at 262 (listing examples of medical treatment, all including the inherent ability to be accomplished). As Petzold admittedly iced

9

prescribed "treatment" was not based on an evaluation, lacked specific instructions, and was ineffective. But, because medical treatment was provided, even if it was negligent, disagreed-with, and based on a perfunctory and inadequate evaluation, it was not denied.[38] Under governing precedent, imperfect treatment does not equal denied treatment. And a disagreement with recommended treatment is generally insufficient to show deliberate indifference.[39]

As there was no genuine dispute of material fact regarding two elements of Petzold's deliberate-indifference claim against Rostollan, the district court properly granted summary judgment.

## B

We next turn to Petzold's deliberate-indifference claim against Wooding. Viewing the record favorably to Petzold, we conclude that no reasonable jury could find that Wooding denied or delayed medical treatment to Petzold.[40]

---

his ankle before and after receiving Rostollan's icing instruction, Rostollan provided medical treatment.

[38] *See Gobert*, 463 F.3d at 345–47; *Domino*, 239 F.3d at 756 (finding that a five-minute "evaluation" that led to no actual medical care was medical treatment).

[39] *Carlucci*, 884 F.3d at 538.

[40] As discussed in Section III(A), the Rostollan deliberate-indifference analysis, Petzold produces evidence showing disputes as to whether the requisite objective risk and substantial harm were present. These findings also apply to the Wooding deliberate-indifference analysis. But, for Wooding, we also find that Petzold produced evidence establishing a factual dispute as to whether Wooding had subjective knowledge of Petzold's fractured ankle. A reasonable jury could infer Wooding's subjective knowledge from Wooding allegedly: (1) seeing Petzold limp, (2) seeing his swollen ankle, and (3) hearing about his extreme pain. *See Lawson*, 286 F.3d at 262. Though Wooding has no medical training, a reasonable jury could nonetheless find that Wooding had actual knowledge of Petzold's fractured ankle because Wooding, as opposed to Rostollan, allegedly had a prolonged encounter with Petzold and saw his grotesquely swollen ankle. *See Gobert*, 463 F.3d at 349 ("[K]nowledge of the health risk inherent in the type of wound establishes the requisite awareness."). But this factual dispute matters not since Petzold fails to show a factual dispute underlying a necessary element of his deliberate-indifference claim.

No. 17-41183

Even if we accept Petzold's uncorroborated assertion that Wooding said he "didn't care about [Petzold's] ankle" and told Petzold to go to sick call on Monday and not to cause additional problems with medical, Wooding did not deny or delay Petzold's treatment. Rostollan had already promptly treated Petzold's injury, and Wooding was aware of the Rostollan-Petzold interaction. Wooding's conduct did not *deny* or *delay* treatment; it *deferred* to a medical professional's prior treatment.[41] Under our precedent, an official defers to prior treatment—and doesn't delay it—when he knows an injured prisoner has recently received medical care and denies the prisoner's additional treatment request for the same injury.[42] For example, Wooding would have denied or delayed Petzold's treatment had Wooding made it impossible for Petzold to effectuate Rostollan's prescribed treatment.[43] But merely refusing to provide additional treatment is insufficient for deliberate indifference. And, if someone is to blame for Petzold not receiving further treatment, it is arguably Petzold himself. Petzold could have sought additional medical attention from the

---

[41] *See Alderson*, 848 F.3d at 422–23 (stating that a delay may only be inferred by an official's conduct clearly preventing the prisoner from receiving prompt medical treatment); *Gobert*, 463 F.3d at 346 ("The decision whether to provide additional treatment is a classic example of a matter for medical judgment"). Wooding's lack of medical training and reliance on Rostollan's expertise bolster this conclusion. *See Davis v. Phillips*, No. 5:15CV48, 2016 WL 11200220, at *2 (E.D. Tex. Dec. 13, 2016), *report and recommendation adopted*, No. 5:15CV48, 2017 WL 941925 (E.D. Tex. Mar. 10, 2017) (concluding that "prison officials are entitled to rely on the opinions and conclusions of qualified medical providers" based on holdings in the Fourth Circuit, Eighth Circuit, and various Texas district courts).

[42] *See Gobert*, 463 F.3d at 350–51 (holding no delay or denial of treatment when a prison doctor deferred to the prior medical judgment of specialists and refused to provide additional antibiotics until the injury worsened). If the ankle injury had dramatically increased in severity between Rostollan's treatment and Wooding's conduct such that Wooding would have effectively denied or delayed treatment for a new injury not previously treated, our analysis may have been different. *See id.*

[43] *Cf. Alderson*, 848 F.3d at 422–23 (stating that an official who ignored a prisoner's multiple requests for his prescribed medication may well have been deliberately indifferent).

No. 17-41183

weekend staff without causing "problems"—that is, in a compliant manner—but he inexplicably chose not to.[44] Petzold cannot disguise his deliberate inaction as Wooding's deliberate indifference.

To the extent Petzold alleges Wooding was deliberately indifferent by failing to supervise Rostollan, this theory also fails because Rostollan did not violate Petzold's rights.[45] Because Petzold does not point to any factual disputes underlying necessary elements of his deliberate-indifference claim against Wooding, summary judgment is appropriate.

IV

We now address Petzold's retaliation claims. "Prison officials may not retaliate against prisoners for exercising their constitutional rights," including their "First Amendment right to file grievances."[46] But to succeed on a retaliation claim, the prisoner must overcome a "significant burden."[47] The prisoner must prove that (1) he or she exercised a constitutional right to which (2) the official *intended* to retaliate against, and (3) the prisoner's

---

[44] *See id.*; *see Galvan v. Calhoun Cty.*, 719 F. App'x 372, 375 (5th Cir. 2018).

[45] *Goodman*, 571 F.3d at 395.

[46] *Butts v. Martin*, 877 F.3d 571, 588 (5th Cir. 2017). Petzold also packaged his First Amendment retaliation claims in a *Bivens* wrapper. But the Supreme Court has only recognized *Bivens* actions for certain Fourth, Fifth, and Eighth Amendment violations. *Abbasi*, 137 S. Ct. at 1857 (chronicling the Court's refusal to create an implied damages remedy for new contexts or new categories of defendants). And, as First Amendment retaliation claims are a "new" *Bivens* context, it is unclear—and unlikely—that *Bivens*'s implied cause of action extends this far. *Abbasi*, 137 S. Ct. at 1859; *Reichle v. Howards*, 566 U.S. 658, 663 n.4 (2012) ("We have never held that *Bivens* extends to First Amendment claims."); *Brunson v. Nichols*, 875 F.3d 275, 278 n.3 (5th Cir. 2017) (collecting pre-*Abbasi* cases and noting that a "First Amendment claim is likely a new [*Bivens*] context"). However, because these constitutional questions are not "sensitive" or "far reaching," and ordinary summary-judgment principles bar the claims in any event, we need not address the *Bivens* issue. *Hernandez*, 137 S. Ct. at 2007; *see supra* note 21.

[47] *Woods v. Smith*, 60 F.3d 1161, 1166 (5th Cir. 1995).

12

constitutional exercise *caused* (4) the official to commit a retaliatory act that was more than de minimis.[48] To prove intent and causation, the prisoner must at least establish a "chronology of events from which retaliation may be plausibly inferred."[49]

## A

The district court properly granted summary judgment on Petzold's retaliation claim against Rostollan. Though Petzold undeniably exercised his First Amendment right to file grievances, there is no genuine factual dispute as to whether Rostollan's retaliatory acts amount to a cognizable retaliation claim. They do not.

We first clarify the retaliatory timeline. Viewing the chronology in Petzold's favor:

1. Petzold filed grievances about the insulin line, grievances that the prison nurses (including Rostollan) disapproved of;
2. Rostollan provided cursory medical treatment to Petzold's ankle;
3. Rostollan falsely reported Petzold's "insolence" to Wooding which led to Petzold's two-hour "dry cell" confinement;
4. Rostollan filed a false incident report and a false discipline report against Petzold; and
5. Petzold filed another grievance against Rostollan, who later made a statement adverse to Petzold while he was in the SHU.

The record shows three possible retaliatory acts committed by Rostollan: (1) hurried medical treatment, (2) filing various false reports, and (3) making an adverse statement. We address each in turn.

---

[48] *See Butts*, 877 F.3d at 588; *Morris v. Powell*, 449 F.3d 682, 684–85 (5th Cir. 2006) (defining *de minimis* as "inconsequential").

[49] *Butts*, 877 F.3d at 588–89.

No. 17-41183

No reasonable jury could infer the requisite causation for Rostollan's provision of treatment in the insulin line. Rostollan did not conduct a comprehensive exam of Petzold, to be sure. He rendered perfunctory and nonspecific treatment. But these acts were dictated by the prison's restrictive protocol, not Rostollan's retaliatory intent.[50] According to the prison's Assistant Health Services Administrator, prison policy is clear: "Unless an inmate presents with a clear medical emergency (e.g., symptoms of a heart attack or stroke, unresponsiveness, seizure, *obvious* broken bone, uncontrollable bleeding, etc.), the insulin and pill line is not the appropriate place, nor means through which, to request medical treatment of an ankle injury."[51] Petzold does not argue his injury was serious enough to require treatment in the insulin line per the prison guidelines. Nor does he present competent evidence that, despite prison guidelines, prison nurses regularly treat inmates in his situation such that he was treated atypically in retaliation.[52] Absent such factual showings, no reasonable jury could find that Rostollan's acts were driven by a retaliatory motive, as opposed to the prison protocol covering such situations.[53] Summary judgment was appropriate for the alleged insulin-line retaliation as Petzold failed to demonstrate a genuine,

---

[50] *See Bibbs*, 541 F.3d at 273–74.

[51] Declaration of Commander Torrey Haskins at 2, *Petzold v. Rostollan*, No. 17–81183 (E. D. Tex. Dec. 19, 2016) (emphasis added).

[52] Though Petzold alleges that he once saw another inmate receive an Ace bandage through the insulin line, we do not consider this evidence because it is an uncorroborated "conclusional allegation." *Carnaby*, 636 F.3d at 187.

[53] *See Bibbs*, 541 F.3d at 273–74. In fact, Petzold alleges that Rostollan was "repeatedly" unprofessional to numerous inmates, showing that Rostollan's alleged abrasiveness was not unique to Petzold but was characteristically ubiquitous.

14

material factual dispute regarding causation, a necessary element of his retaliation claim.

But a reasonable jury *could* infer the requisite causation for Rostollan's false filings and adverse statement. Petzold shows specific factual evidence demonstrating a genuine, material factual dispute underlying whether the requisite intent and causation may be plausibly inferred for these retaliatory acts.[54] There was a "tight[] chain of events" between the predicate events and alleged retaliatory acts—ranging from less than an hour to almost a month.[55] And Rostollan, the nurse who was the implicit and explicit subject of Petzold's grievances, committed the allegedly retaliatory acts.[56] A reasonable jury could plausibly infer intent and causation from this alleged chronology.

Yet, even considering this inference in Petzold's favor, no reasonable jury could find that these "retaliatory" actions had consequences that were more than de minimis.[57] The two hours spent in a dry cell because of the false complaint were inconsequential.[58] Rostollan's allegedly false medical report, false disciplinary report, and adverse statement in the SHU had no repercussions and were inconsequential.[59] As Petzold made no factual showing

---

[54] *See Butts*, 877 F.3d at 588.

[55] *Id.* at 589 (reversing a grant of summary judgment on a retaliation claim in part because of the two-hour gap between the filed grievance and alleged retaliatory acts).

[56] *Bibbs*, 541 F.3d at 273–74 (reversing a grant of summary judgment on a retaliation claim in part because the guards who committed the retaliatory acts were the same guards subject to the complaint).

[57] *Morris*, 449 F.3d at 684–85.

[58] *See Gibbs v. King*, 779 F.2d 1040, 1046 (5th Cir. 1986) (reasoning that "a single incident, involving a minor sanction" was not "sufficient" to classify as "harass[ent] [of] an inmate in retaliation . . . .").

[59] *Morris*, 449 F.3d at 85 (stating that only "serious" allegations of retaliations are legitimate).

No. 17-41183

of serious consequences, no reasonable jury could find that these acts were cognizable. Summary judgment was thus appropriate.

B

Summary judgment was also proper on Petzold's retaliation claim against Williams. The record is clear that Petzold failed to exhaust his administrative remedies as required by the Prison Litigation Reform Act.[60]

The PLRA's exhaustion provision bars a prisoner's claim if the prisoner did not pursue all available administrative remedies before filing suit.[61] "Thus federal prisoners suing under *Bivens* . . . must first exhaust inmate grievance procedures just as state prisoners must exhaust administrative processes prior to instituting a § 1983 suit."[62] A prisoner exhausts all available administrative remedies for a claim only if he or she (1) completes the prison's grievance process (2) in a manner "sufficiently specific to give 'officials a fair opportunity to address the problem that will later form the basis of the lawsuit.' "[63]

Petzold is subject to the Federal Bureau of Prison's grievance process.[64] To meet the exhaustion requirement for his retaliation claim against Williams, Petzold must have totally exhausted the Bureau's four-step process—(1) informal resolution, (2) formal administrative grievance ("step-one grievance"), (3) regional appeal, and (4) national appeal.[65] As Petzold never filed a step-one

---

[60] Petzold undisputedly exhausted every other claim *except* for his retaliation claim against Williams.

[61] 42 U.S.C. § 1997e(a); *Porter v. Nussle*, 534 U.S. 516, 524 (2002).

[62] *Nussle*, 534 U.S. at 524.

[63] *Jones v. Bock*, 549 U.S. 199, 218 (2007); *Butts*, 877 F.3d at 582.

[64] 28 C.F.R. §§ 542.13–15.

[65] *Id.*

grievance that included his "sufficiently specific" retaliation claim against Williams, this claim is barred by exhaustion.

Petzold's only argument is that, in his final step-one grievance, he implicitly included his retaliation claim against Williams through his statement, "[I] didn't want to remain locked up in [the SHU] for an extended period of time." Petzold asserts that this statement sufficiently conveys the factual basis for his retaliation claim against Williams and meets the exhaustion requirement. But this statement doesn't explicitly allege retaliation; it doesn't even mention Williams by name.[66] Even if we liberally assume that this statement does vaguely include the Williams claim, it clearly was not "sufficiently specific" to avoid Defendants' exhaustion defense.[67] Petzold didn't even allege that an official's wrongful conduct was the reason he was kept in the SHU. Petzold cannot seriously argue that Williams was on notice of his alleged retaliation such that he had "fair opportunity to address the problem."[68] Exhaustion is a prerequisite to suit, and no reasonable jury could find that Petzold exhausted his retaliation claim against Williams.[69]

V

In any event, and joining belt with suspenders, Defendants are entitled to qualified immunity. "Qualified immunity shields government officials from liability when they are acting within their discretionary authority and their

---

[66] *Butts*, 877 F.3d at 583 (holding that the prisoner did not exhaust his claim when he included a factual summary of the alleged violation but did not explicitly complain against the prison official for the specific conduct).

[67] *Id.* at 582 (stating that this court strictly applies exhaustion).

[68] *Jones*, 549 U.S. at 218.

[69] Here, too, given the district court's proper rejection of Petzold's retaliation claim on exhaustion grounds, we need not reach whether it is a permissible basis for a *Bivens* claim.

conduct does not violate clearly established statutory or constitutional law of which a reasonable person would have known."[70] To rebut the qualified immunity defense, a plaintiff must show two things: (1) the allegations make out a violation, and (2) the violation was "clearly established" at the time of the defendant's conduct.[71]

Defendants here properly invoked qualified immunity. In response, Petzold failed to show a material factual dispute as to whether Defendants violated *any* constitutional rights, much less *clearly established* constitutional rights. As for Petzold's Eighth and First Amendment claims against Rostollan and Wooding, Petzold did not produce—because he *could* not produce (as discussed above)—any evidence showing the existence of a genuine issue for trial. As for the claims aimed at Williams, and even setting aside the dispositive exhaustion defense, Williams's "retaliatory" actions surely did not violate Petzold's First Amendment right. Petzold alleges no competent evidence that his grievance filings caused Williams to put him in the SHU.[72] Petzold thus failed to show a violation of law, clearly established or otherwise. All to say, Defendants were entitled to qualified immunity.

\* \* \*

The district court properly granted summary judgment in favor of Defendants. We AFFIRM.

---

[70] *Gates v. Tex. Dep't of Protective & Regulatory Servs.*, 537 F.3d 404, 418 (5th Cir. 2008).

[71] *Carroll v. Ellington*, 800 F.3d 154, 169 (5th Cir. 2015); *see also Kovacic v. Villarreal*, 628 F.3d 209, 211 (5th Cir. 2010) ("Once a defendant invokes qualified immunity, the burden shifts to the plaintiff to show that the defense is not available.").

[72] *See Butts*, 877 F.3d at 588. To the contrary, the defendants produce undisputed evidence that Petzold's placement in the SHU was "routine[]" and for the staffs' and Petzold's protection.

No. 17-41183

ANDREW S. OLDHAM, Circuit Judge, concurring in the judgment:

The Supreme Court has told us that "the *Bivens* question . . . is antecedent to the other questions presented" in a case like this. *Hernandez v. Mesa*, 137 S. Ct. 2003, 2006 (2017) (quotation omitted). "The *Bivens* question," of course, is whether Mr. Petzold has an implied cause of action under the Eighth Amendment. I agree with the Court's cogent explanation for why he does not. *Ante*, at 6, n. 21 (discussing *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1856–58, 1865 (2017)); *see Cantú v. Moody*, 933 F.3d 414, 421–22 (5th Cir. 2019) (quoting *Abbasi*, 137 S. Ct. at 1857) (noting that we are loath to engage in the "disfavored judicial activity" of extending *Bivens* to a new set of facts). In my view, that is the beginning and end of this case.

It is true that, in the past, courts occasionally skipped the antecedent *Bivens* question and rejected plaintiffs' claims on the underlying constitutional question. *See, e.g.*, *Wood v. Moss*, 572 U.S. 744, 757 (2014) (skipping the *Bivens* question because it was not preserved below and hence "not presented in [the Supreme] Court"). But those cases came before *Abbasi*. And it is not clear that we have the same liberty today. After *Abbasi* and *Hernandez*, once we determine the plaintiff has no cause of action, we should say so and no more. *See Hernandez*, 137 S. Ct. at 2007 (vacating our decision to skip the *Bivens* question "in light of the intervening guidance provided in *Abbasi*"); *cf. Chafin v. Chafin*, 568 U.S. 165, 172 (2013) ("Federal courts may not decide questions that cannot affect the rights of litigants in the case before them or give opinions advising what the law would be upon a hypothetical state of facts." (quotation omitted)).

19