# United States Court of Appeals
## for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

October 23, 2020

Lyle W. Cayce
Clerk

No. 19-40887

Emmanuel Angulo,

*Plaintiff—Appellant*,

*versus*

Shawn Brown, *Agent*, United States Customs and Border Protection; Jeffery McCrystal, *Agent*, United States Customs and Border Protection; United States of America,

*Defendants—Appellees*.

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 1:18-CV-50

Before Smith, Clement, and Oldham, *Circuit Judges*.
Edith Brown Clement, *Circuit Judge*:

Plaintiff Emmanuel Angulo sued the United States of America and Customs and Border Protection ("CBP") Officers Shawn Brown and Jeffery McCrystal for injuries suffered during an incident at the International Port of Entry Gateway Bridge in Brownsville, Texas. The district court dismissed Angulo's claims against the United States for lack of subject-matter jurisdiction based on the customs-duty exception to the Federal Tort Claims

No. 19-40887

Act ("FTCA"). The district court also granted summary judgment in favor of Brown and McCrystal based on qualified immunity. We AFFIRM.

## I. Facts and Proceedings

At the time of the events at issue, Angulo was a 71-year-old U.S. citizen, was a retired military veteran, and suffered from disabilities including cervical myelopathy and impaired hearing. In 2016, while returning from a visit to Matamoros, Mexico, Angulo and a passenger were stopped by Brown in one of the marked lanes at the port of entry. Surveillance cameras captured what followed. Although both are soundless, the videos provide important information about the interaction between Angulo and the CBP officers. One video, an external camera, captured events from the front of Angulo's van, and the other, an internal camera in the passport control office, captured events that took place inside the office.

Angulo alleges that Brown greeted and began questioning him in Spanish, which Angulo took to be disrespectful and racially motivated. Angulo asked to speak with a supervisor. The video shows Brown speaking to Angulo, opening the rear door of the van to look inside, and repeatedly stepping into the inspection station booth and then reemerging to continue the conversation over the course of about five minutes. During this time Angulo can be seen leaning out his window and gesturing to Brown.

About five minutes into the interaction, Brown placed a piece of paper on Angulo's windshield and gestured forward, directing Angulo to the secondary inspection site for further examination. Angulo pulled forward slightly, then abruptly stopped to verify that he would have the opportunity to speak with Brown's supervisor. Brown asked Angulo to shut off his vehicle and hand over his keys; Angulo complied.

No. 19-40887

Two other officers, McCrystal and Officer Eduardo Guerra,[1] approached the vehicle from the secondary inspection area because they heard yelling coming from Brown's lane. While Brown stepped away from Angulo's car door to move a parking cone out of the way, McCrystal approached the driver's side window and spoke briefly with Angulo.

What happened next is disputed. Angulo claims that "McCrystal without any warning[ ] opened the door to the motor vehicle, . . . grabbed Mr. Angulo by the neck and forcibly threw Mr. Angulo to the ground and placed handcuffs on Mr. Angulo with the assistance of Agent Brown."

The Government argues that McCrystal asked Angulo to unlock the door, and that Angulo complied. McCrystal then opened the car door and asked Angulo to exit the vehicle; Angulo did not comply. McCrystal claims that he attempted to help Angulo from the vehicle, but that when Angulo resisted he used a "shoulder-pin restraint technique" to remove Angulo from the vehicle.

The video depicts McCrystal approaching the driver's side window and conversing briefly with Angulo. He appears to pull on the door handle, then says something to Angulo, and finally he opens the door. McCrystal converses further with Angulo before holding out a hand. The van lurches forward.[2] McCrystal then reaches one arm into the van, which rocks slightly, before McCrystal leans into the van with both arms. After a brief struggle, McCrystal emerges holding Angulo with both arms wrapped around his body, and then both fall to the ground. The view of what happens next is

---

[1] Guerra was named as a defendant in Angulo's initial complaint but was not referenced in Angulo's amended complaint.

[2] Angulo had stopped the van atop a speed bump when he stopped to verify that he would have a chance to speak with Brown's supervisor; the lurch appears to be the van settling down from atop the speed bump.

obstructed by the van door and Guerra's body, but the parties agree that this was when McCrystal, with Brown's assistance, placed handcuffs on Angulo while he was on the ground.

The video shows that, a few moments later, McCrystal raises a handcuffed Angulo to his feet and leads him toward the passport control office. Angulo stumbles and falls, so Brown joins McCrystal, and the two agents help Angulo to his feet and escort him to an interior office for further questioning. Angulo alleges that the officers "forcibly marched and/or dragged" him to the interrogation area, but both the exterior and interior videos depict the three men walking under their own power, albeit at a brisk pace. At no point do the videos depict Angulo being "dragged."

The parties agree that, once the officers and Angulo had reached the interior interrogation room, the handcuffs were removed, and Angulo was searched and interviewed by two supervisory CBP officers. Angulo was released after questioning. The entire incident, from the time Angulo first pulled into the primary inspection lane until he is seen on the video getting back into his van and leaving, lasted just over one hour.

Angulo sued the United States under the FTCA for assault, false arrest, false imprisonment, and intentional infliction of emotional distress. He also sued Officers Brown and McCrystal pursuant to *Bivens* for unreasonable seizure, false arrest, and false imprisonment in violation of the Fourth Amendment and excessive force in violation of the Fourth Amendment. *See Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971).

The Government filed a motion to dismiss claims against the United States under Rule 12(b)(1) for lack of jurisdiction and to dismiss claims against the officers under Rule 12(b)(6) for failure to state a claim or, in the alternative, for summary judgment in favor of the officers.

The district court dismissed all claims against the United States, finding that, because the customs-duty exception to the FTCA found in 28 U.S.C. § 2680(c) applied to Angulo's claims, the United States had not waived sovereign immunity.

The district also court converted the motion to dismiss Angulo's *Bivens* claims against the officers into a motion for summary judgment based on a defense of qualified immunity, which it granted. The district court found Angulo's claims for unreasonable seizure, false arrest, and false imprisonment failed because Angulo had not been arrested or unreasonably seized, and his claims for excessive force failed because Brown and McCrystal had not used unreasonable or excessive force.

Angulo timely appealed.

## II. Standard of Review

We review the grant of summary judgment de novo and apply the same standard as the district court. *Romero v. City of Grapevine*, 888 F.3d 170, 175 (5th Cir. 2018). Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Although we review evidence in the light most favorable to the nonmoving party, we assign greater weight . . . to the facts evident from video recordings taken at the scene." *Carnaby v. City of Houston*, 636 F.3d 183, 187 (5th Cir. 2011). Thus, we consider "the facts in the light depicted by the videotape," resolving conflicts in the nonmovant's favor only where Angulo's assertions are not "blatantly contradicted" by video evidence. *Scott v. Harris*, 550 U.S. 372, 380–81 (2007).

We review dismissals under Federal Rule of Civil Procedure 12(b)(1) based on exceptions to the FTCA de novo. *Jeanmarie v. United States*, 242 F.3d 600, 602 (5th Cir. 2001).

## III. Discussion

Angulo argues on appeal that granting summary judgment based on qualified immunity on his unreasonable seizure claim was improper because he was either arrested without probable cause or, at a minimum, seized without reasonable suspicion. He also argues that the district court misapplied the test for excessive use of force laid out in *Graham v. Connor*, 490 U.S. 386 (1989), and should have found that Angulo was clearly subjected to excessive force under the circumstances.

Angulo also argues that 28 U.S.C. § 2680(c)'s customs-duty exception to the FTCA's waiver of sovereign immunity cannot apply to intentional tort claims without eviscerating 28 U.S.C. § 2680(h)'s waiver for "assault, battery, false imprisonment, false arrest, malicious prosecution," etc. when committed by a law enforcement officer. Even if the Government's reading of § 2680(c) and (h) is correct and the subsections are reconcilable, Angulo argues that § 2680(c) is inapplicable in this instance because the search on his vehicle had not yet begun when McCrystal pulled Angulo from the vehicle.

### A.

"Qualified immunity shields federal and state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (cleaned up).[3] "Qualified immunity shields from liability 'all but the

---

[3] As an antecedent matter, the Government asserted—briefly—that Angulo should not have recourse to a *Bivens* action in the first place because the border is a new *Bivens* context and special factors counsel against implying an action. *See Ziglar v. Abbasi*, 137 S. Ct. 1843, 1857–58 ("[T]he Court has made clear that expanding the *Bivens* remedy is now a 'disfavored' judicial activity."). Although this court has recognized *Bivens* actions against

plainly incompetent or those who knowingly violate the law.' Accordingly, 'qualified immunity represents the norm,' and courts should deny a defendant immunity only in rare circumstances." *Romero*, 888 F.3d at 176 (first quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986), and then quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 807 (1982)). The plaintiff has the burden to negate a properly raised defense of qualified immunity. *Poole v. City of Shreveport*, 691 F.3d 624, 627 (5th Cir. 2012).

Thus, to avoid summary judgment, Angulo must show that—viewing the evidence in the light most favorable to his claims and resolving factual disputes in his favor—he has put forth enough evidence that a jury could

---

CBP officers in the past, *see Martinez-Aguero v. Gonzalez*, 459 F.3d 618 (5th Cir. 2006) (denying qualified immunity to CBP agent at border on *Bivens* claim), *cert. denied,* 549 U.S. 1096 (2006), the Supreme Court's recent ruling in *Hernandez v. Mesa* strongly implies that proximity to the border alone is sufficient to qualify as a "new context" in which *Bivens* is unavailable, 140 S. Ct. 735 (2020) ("Since regulating the conduct of agents at the border unquestionably has national security implications, the risk of undermining border security provides reason to hesitate before extending *Bivens* into this field.").

Nonetheless, we will assume without deciding that a *Bivens* remedy is available for three reasons. First, the international implications of a cross-border shooting—of vital importance in *Hernandez*—are not present here, where the dispute is more similar to standard Fourth Amendment unreasonable seizure cases to which *Bivens* has applied in the past. Second, the Supreme Court has expressly endorsed the "assume-and-dispose" approach in "appropriate" cases. *See Hernandez v. Mesa*, 137 S. Ct. 2003, 2007 (2017); *Wood v. Moss*, 572 U.S. 744, 757 (2014) (assuming without deciding that a *Bivens* remedy exists, despite describing it as "an antecedent issue"). This court has done the same. *See Petzold v. Rostollan*, 946 F.3d 242, 248 n.21 (5th Cir. 2019); *Serrano v. Customs & Border Patrol*, --- F.3d ---, 2020 WL 5539130, at *11 (5th Cir. Sept. 16, 2020). Third, the Supreme Court has "repeatedly stressed the importance of resolving immunity questions at the earliest possible stage of the litigation." *Wood*, 572 U.S. at 755 n.4 (cleaned up). We can resolve this case now, without having to decide—lacking the benefit of a district court opinion and with only a single paragraph of briefing—whether *Hernandez* should be understood to categorically preclude *Bivens* actions against CBP agents at the border. So, we do.

rationally find that he was unreasonably seized or arrested and that he was subjected to unreasonably excessive force in the process.

(1)

In order to make out a claim for unreasonable seizure, false arrest, or false imprisonment under the Fourth Amendment, Angulo must show that he was unreasonably seized. Although Angulo concedes that CBP had the right to stop him at the border, he argues that he was arrested without probable cause—or at a minimum, seized without reasonable suspicion—when he was removed from his vehicle, handcuffed, and brought into the passport control office for questioning. Warrantless seizures are "*per se* unreasonable unless they fall within a few narrowly defined exceptions," such as arrest with probable cause or a temporary seizure based on reasonable suspicion. *United States v. Ho*, 94 F.3d 932, 935 (5th Cir. 1996). Relevant here, one such "important exception is the border search doctrine." *United States v. Cardenas*, 9 F.3d 1139, 1147 (5th Cir. 1993).

We have long recognized the Government's "plenary authority to conduct routine searches and seizures at the border, without probable cause or a warrant." *United States v. Montoya de Hernandez*, 473 U.S. 531, 537 (1985). As our colleagues in the Second Circuit explained, "a suspicionless search at the border is permissible under the Fourth Amendment so long as it is considered to be 'routine.'" *Tabbaa v. Chertoff*, 509 F.3d 89, 98 (2d Cir. 2007). Because this interaction took place at the border in the context of Angulo's seeking entry to the United States, the Government was *entitled* to conduct a routine search. *United States v. Ramsey*, 431 U.S. 606, 616 ("[S]earches made at the border, pursuant to the long-standing right of the sovereign to protect itself by stopping and examining persons and property crossing into this country, are reasonable simply by virtue of the fact that they occur at the border.").

Here, CBP intended to question Angulo briefly and search his vehicle. The Government does not need to show any level of suspicion to thoroughly search an entrant's vehicle at the border. *United States v. Flores-Montano*, 541 U.S. 149, 152 (2004). Courts have held that substantially longer and more invasive searches than that to which Angulo was subjected were nonetheless "routine" searches that required no level of particularized suspicion. *See, e.g.*, *id.* at 154 (finding that removal, disassembly, and reassembly of a fuel tank was routine); *Tabbaa*, 509 F.3d at 95–99 (finding that detaining entrants for four to six hours, subjecting them to pat-downs, and forcibly kicking their feet open were nonetheless routine).

The hour of questioning is unquestionably within the Government's power, since "delays of one to two hours at international borders are to be expected." *Flores-Montano*, 541 U.S. at 155 n.3. Similarly, removing Angulo from his vehicle and handcuffing him were only necessary because Angulo refused to exit the vehicle voluntarily on his own. *See Tabbaa*, 509 F.3d at 100 ("[B]order crossers cannot, by their own non-compliance, turn an otherwise routine search into a non-routine one."). This was a routine inspection.

Angulo insists that what he experienced amounted to arrest, not mere seizure for inspection. However, when the Government has authority to stop or seize a person or property, that authority "necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Graham*, 490 U.S. at 396. Even outside the border context, using moderate force and applying handcuffs are not enough to convert a stop into an arrest. *See United States v. Sanders*, 994 F.2d 200, 206 (5th Cir. 1993) ("Clearly, using some force on a suspect, pointing a weapon at a suspect, ordering a suspect to lie on the ground, and handcuffing a suspect—whether singly or in combination—do not automatically convert an investigatory detention into an arrest requiring probable cause.").

In *Sanders*, for example, this court emphasized that handcuffs were merely a precaution in support of a reasonable detention. *Id.* at 209. Here, handcuffs were briefly applied to a suspect resisting a lawful inspection and refusing to comply with reasonable commands necessary to carry out such an inspection; they were removed promptly once Angulo reached the interview room and was frisked. In the border context, this interaction lacked indicia sufficient to lead a reasonable person to believe he had been arrested. We therefore find that Angulo was neither arrested nor unreasonably seized.

(2)

Even when a seizure is otherwise justified, however, the use of force to effect that seizure must be reasonable. To overcome the officers' qualified immunity defense on the excessive force claim, Angulo "must show '(1) an injury, (2) which resulted directly and only from a use of force that was clearly excessive, and (3) the excessiveness of which was clearly unreasonable.'" *Poole*, 691 F.3d at 628 (quoting *Ontiveros v. City of Rosenberg*, 564 F.3d 379, 382 (5th Cir. 2009)). Injury need not be substantial but must be more than *de minimis*. *Hanks v. Rogers*, 853 F.3d 738, 744–45 (5th Cir. 2017). Here, the reasonableness prong is dispositive, so that is where we turn our attention.

The Supreme Court has explained that the "'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396. Courts should consider such factors as "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* A use of force is more likely to be reasonable when officers use "measured and ascending" actions that correspond to a suspect's level of compliance or resistance. *See, e.g.*, *Poole*, 691 F.3d at 629; *Galvan v. City of San Antonio*, 435 F. App'x 309, 311 (5th Cir.

2010) (finding use of force reasonable when it involved "measured and ascending responses" to a plaintiff's noncompliance).

The context of our analysis is an international border crossing, where the "Government's interest in preventing the entry of unwanted persons and effects is at its zenith." *Flores-Montano*, 541 U.S. at 152. Brown had plenary authority to search Angulo and his vehicle and a duty to question him. When "a car has been legitimately stopped by law enforcement officers, requesting occupants to step out of the vehicle is a *de minimis* additional intrusion that is outweighed by the government's legitimate and weighty interest in officer safety." *Davila v. United States*, 713 F.3d 248, 260 (5th Cir. 2013) (cleaned up).

Angulo alleges that he was peacefully conversing with Brown (albeit tensely, given that he was accusing Brown of racism and demanding to speak with Brown's supervisor) and complying with all requests when he was violently accosted by McCrystal, who allegedly grabbed him by the neck and forcibly threw him to the ground. This is "blatantly contradicted" by the video evidence. *Scott*, 550 U.S. at 380–81 ("The Court of Appeals should not have relied on such visible fiction; it should have viewed the facts in the light depicted by the videotape.").

The video shows McCrystal and Guerra arriving to help Brown, after several minutes of Brown's interacting calmly with a wildly gesticulating and uncooperative Angulo. McCrystal speaks with Angulo briefly, then attempts to open the door. It is clearly locked, so he speaks with Angulo again. He tries the door again, and again is unable to open it. He says something further to Angulo, while pointing inside the window, and then successfully opens the door. He then speaks with Angulo for several seconds, apparently asking him to exit the vehicle; Angulo does not exit the vehicle. McCrystal briefly holds a hand out to Angulo (explained by McCrystal as an effort to help Angulo

from the vehicle); Angulo neither accepts the proffered assistance nor exits on his own. McCrystal reaches into the vehicle with one arm; Angulo resists this effort to extract him from the vehicle with such force that the vehicle rocks to one side and the headlights flicker. Finally, McCrystal reaches in with both arms, wraps them around Angulo's midsection, and extracts Angulo. McCrystal and Brown both testified that this was a standard "shoulder-pin restraint technique" that the officers had been trained to use under such circumstances; McCrystal visibly did *not* grab Angulo by the neck or throw him to the ground. In short, the video shows the officers using reasonable force to compel Angulo's compliance with a command that they were legally entitled to give him.

The reasonableness inquiry is objective and based on what the officers knew at the time. *Poole*, 691 F.3d at 628. Angulo argues that he "did not fail to give a declaration at Agent Brown's request. Rather, his hearing disability made it so he did not hear the questions." Objectively, Brown could not know Angulo's *reason* for failing to respond to questions while communicating clearly at other times—he knew only that Angulo was failing to respond to questions. Brown reasonably interpreted this refusal to answer standard questions, coupled with Angulo's "completely unnecessary attitude[, as] an attempt to distract [him] from the inspection," which reasonably raises suspicion that Angulo has a *reason* for trying to distract Brown from properly inspecting his vehicle.

Angulo asserts that long-standing shoulder issues made the handcuffing unusually painful for him. This may be true, but the officers did not have access to Angulo's health records. They couldn't determine how different means of asserting control would affect him personally—only that they needed to "take reasonable steps to assert command of the situation." *Davila*, 713 F.3d at 260 ("The risk of harm to both the police and the occupants of a stopped vehicle is minimized if the officers routinely exercise

unquestioned command of the situation." (quoting *Arizona v. Johnson*, 555 U.S. 323, 330 (2009)) (cleaned up)). Immobilizing a resisting suspect with handcuffs is a reasonable step to assert command of the situation, particularly where, as here, the handcuffs were removed just a few minutes later after the suspect had been taken to an interview room.

Angulo relies on *Deville v. Marcantel* for the proposition that forcefully removing someone from his or her vehicle, if unnecessary, can constitute excessive force. 567 F.3d 156 (5th Cir. 2009). *Deville* is readily distinguishable. In *Deville*, the plaintiff posed no risk of flight, she was not suspected of committing any crime that would justify arrest, and officers "engaged in very little, if any, negotiation with her" before "quickly resort[ing] to breaking her driver's side window and dragging her out of the vehicle." *Id.* at 167–68. Because she was not legitimately suspected of a crime (nor for any other reason lawfully stopped), the officers also had no *right* to ask her to step out of her vehicle or to arrest her. *Id.* at 164–65.

By contrast, here the officers had an indisputable right to inspect Angulo's vehicle, including by ordering him out of it. *See Montoya de Hernandez*, 473 U.S. at 537–38; *Davila*, 713 F.3d at 260. This also includes the implied right to use appropriate physical force to carry out the search, if necessary. *Graham*, 490 U.S. at 396. Video evidence clearly depicts officers engaging in negotiation to extract Angulo from his vehicle peacefully. They had reason to suspect that he might be engaged in the type of serious criminal activity that would correspond to a suspected effort to distract officers from conducting a proper inspection, such as smuggling. Angulo actively resisted this search and failed to answer the officers' questions. In the face of active resistance, the officers responded with "'measured and ascending' actions that corresponded to" Angulo's "escalating verbal and physical resistance." *Poole*, 691 F.3d at 629.

Because the officers did not use excessive force, they are entitled to qualified immunity.

## B.

Finally, Angulo argues that the customs-duty exception to the FTCA should not apply here. The FTCA waives sovereign immunity for claims "for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment." 28 U.S.C. § 1346(b)(1). However, under the customs-duty exception, that waiver does not apply to "[a]ny claim arising in respect of the assessment or collection of any tax or customs duty, or the detention of any goods, merchandise, or other property by any officer of customs or excise." 28 U.S.C. § 2680(c).

The Supreme Court has interpreted the exception broadly, explaining that "'any claim arising in respect of' the detention of goods means any claim 'arising out of' the detention of goods." *Kosak v. United States*, 465 U.S. 848, 854 (1984). This court has held that this includes intentional tort claims that arise out of "the inspection, seizure, or detention of goods by a Customs agent." *Jeanmarie*, 242 F.3d at 604. In interpreting § 2680, we are cognizant that "[s]tatutes waiving sovereign immunity of the United States are to be 'construed strictly in favor of the sovereign.'" *Id.*; *see also United States v. Nordic Vill., Inc.*, 503 U.S. 30, 34 ("[T]he Government's consent to be sued must be construed strictly in favor of the sovereign."(cleaned up)).

Angulo notes that § 2680(h) preserves the Government's sovereign immunity for claims involving "assault, battery, false imprisonment, false arrest," and other intentional torts, *except* when such torts are committed by "investigative or law enforcement officers of the United States Government." He argues that applying § 2680(c) to intentional torts by CBP officers eviscerates the "exception to the exception" in § 2680(h).

14

When presented with this argument in the past, we have agreed with our colleagues in the Ninth Circuit that "§§ 2680(c) and 2680(h) must be interpreted in a manner that reconciles them, without doing violence to either." *Gasho v. United States*, 39 F.3d 1420, 1433 (9th Cir. 1994). As this court explained in *Jeanmarie*, "[w]e agree with the Ninth Circuit that '[w]hen strictly construed in light of § 2680(c), the waiver of immunity in § 2680(h) applies only to tortious conduct not involving the seizure and detention of goods by Customs.'" 242 F.3d at 604–05 (quoting *Gasho*, 39 F.3d at 1433–34); *see also Davila*, 713 F.3d at 256 ("[E]ven intentional torts committed by law enforcement officers are exempt from FTCA suits when such torts were committed during circumstances that would warrant a detention-of-goods exception.").

Angulo's second effort to navigate around § 2680(c) is to argue that his treatment arose prior to the inspection of his vehicle, while he was still being directed to the secondary inspection area, so § 2680(c) is inapplicable. Angulo cites *Davila*, in which this court held that § 2680(c) did not apply where the tort was allegedly committed after another suspect (the plaintiff's son) had already fled in the vehicle, so the tort was "unrelated to the vehicle or the detention thereof." 713 F.3d at 257.

This argument finds no support in the facts. Although Angulo's secondary inspection had not yet begun, the primary inspection had—the video shows Brown opening the van's rear door and sticking his head in to look around. McCrystal removed Angulo from the van specifically for the purpose of facilitating the ongoing detention and inspection of the van. To be sure, the officers had to pause their ongoing inspection of Angulo's vehicle to turn their attention to removing him therefrom when he resisted, but that brief pause clearly does not unmoor the allegations here from the underlying inspection and uninterrupted detention of the van.

The facts in this case being far more similar to *Jeanmarie* than to *Davila*, we hold that *Jeanmarie* controls, and § 2680(c) applies. The United States has not waived sovereign immunity, and the district court properly dismissed Angulo's FTCA claims for lack of subject-matter jurisdiction.

## IV. Conclusion

For the foregoing reasons, the district court's judgment is AFFIRMED.

No. 19-40887

ANDREW S. OLDHAM, *Circuit Judge*, concurring in part:

The majority correctly holds that the customs-duty exception to the Federal Tort Claims Act bars Angulo's claims against the United States. I therefore join the majority's excellent discussion of those claims in full. And the majority correctly suggests that Angulo lacks a cause of action to sue the individual CBP officers under *Bivens*. *See ante*, at 6 n.3. I would stop there.

The Supreme Court has told us that "the *Bivens* question . . . is antecedent to the [constitutional] questions presented" in a case like this. *Hernandez v. Mesa*, 137 S. Ct. 2003, 2006 (2017) (per curiam) (quotation omitted); *see also ante*, at 6 n.3 (noting the *Bivens* question is "an antecedent matter"). Once we're satisfied the answer to that question is that the plaintiff lacks a cause of action, "we should say so and no more." *Petzold v. Rostollan*, 946 F.3d 242, 256 (5th Cir. 2019) (Oldham, J., concurring in the judgment). Why? For one thing, I don't think we should use our Article III power to resolve a question that the plaintiff lacks a cause of action to present. *Cf. Chafin v. Chafin*, 568 U.S. 165, 172 (2013) ("Federal courts may not decide questions that cannot affect the rights of litigants in the case before them or give opinions advising what the law would be upon a hypothetical state of facts." (quotation omitted)).

That's especially true when the cause-of-action-lacking plaintiff wants us to answer a *constitutional* question. "It is a well established principle governing the prudent exercise of [federal court] jurisdiction that normally [we should] not decide a constitutional question if there is some other ground upon which to dispose of the case." *Escambia County v. McMillan*, 466 U.S. 48, 51 (1984) (per curiam). This "procedural avoidance" doctrine has frequently led the Supreme Court to focus on "an antecedent statutory issue, even one waived by the parties, [when] its resolution could preclude a constitutional claim." Adrian Vermeule, *Saving Constructions*, 15 GEO. L.J.

1945, 1948–49 (1997). *See, e.g.*, *Escambia County*, 466 U.S. at 51–52 (remanding for court of appeals to consider statutory argument because "[a]ffirmance on the statutory ground would moot the constitutional issues"); *Edward J. DeBartolo Corp. v. NLRB*, 463 U.S. 147, 158 (1983) ("Until the statutory question is decided, review of the constitutional issue is premature."). The doctrine is also the motivating force behind *Pullman* abstention. *See R.R. Comm'n of Tex. v. Pullman Co.*, 312 U.S. 496, 498 (1941) ("Such constitutional adjudication plainly can be avoided if a definitive ruling on the state issue would terminate the controversy. It is therefore our duty to turn to . . . questions under Texas law.").

It's true that the Supreme Court has skipped the antecedent *Bivens* question "on occasion." *Hernandez*, 137 S. Ct. at 2007. But it refused to do so in *Hernandez*, opting instead to vacate our decision on the constitutional merits because "intervening guidance provided in [*Ziglar v.*] *Abbasi*" meant answering the *Bivens* question "may" be sufficient "to resolve th[e] . . . case." *Ibid. Bivens* is likewise sufficient here. So I'd stop there.