# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

July 13, 2021

Lyle W. Cayce
Clerk

No. 20-30554

Donna Mahl Rombach, *on behalf of the minor child*, D.A.R.;
Estate of Gregory Rombach,

*Plaintiffs—Appellants*,

*versus*

Joe Culpepper, *individually and in his official capacity as* Chief of
Police, City of Bogalusa, Louisiana; Scott Adams,
*individually and in his official capacity as* Warden, Bogalusa City
Jail; Wendy O'Quin Perrette, *individually and in her official
capacity as* Mayor, City of Bogalusa; Unidentified Parties,
*individually and in their official capacities*; Otis Taylor; Louis
Clark; Lesley Knight; Lisa Erwin; Leonard Powell;
Lashonda Payton; City of Bogalusa,

*Defendants—Appellees*.

Appeal from the United States District Court
for the Eastern District of Louisiana
USDC No. 2:16-CV-556

Before Clement, Haynes, and Wilson, *Circuit Judges*.

Per Curiam:*

---

* Pursuant to 5th Circuit Rule 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5th Circuit Rule 47.5.4.

No. 20-30554

This qualified immunity case arises from the death of a state custody inmate, Gregory Rombach, at the Bogalusa city jail.  The Plaintiffs, Rombach's minor child and his estate, appeal the district court's grant of qualified immunity, and summary judgment, to the Defendants.  We affirm the district court's dismissal of the Plaintiffs' 42 U.S.C. § 1983 and municipal liability claims.  We further affirm the dismissal of the Plaintiffs' state law claims against the Defendants.

## I.

## A.

In the early morning hours of July 6, 2015, Bogalusa Police Department (BPD) officers arrested Rombach for shoplifting from a Walmart in Bogalusa, Louisiana.  He was transported to the city jail where officers learned that there was an outstanding arrest warrant for his failure to appear in an unrelated criminal matter.  During booking, officers conducted a cursory medical assessment of Rombach.  They discerned no visual signs of illness, drug withdrawal, or need for immediate medical attention.  Rombach likewise reported no previous or current medical conditions, other than an allergy to penicillin, and he denied regularly using alcohol or drugs.

That afternoon, Rombach appeared in the Bogalusa city court to respond to his existing charge for failure to appear in the unrelated criminal matter.  The city court judge found Rombach in contempt and sentenced him to serve fifteen days in jail or pay a $250.00 fine.  The judge also continued his arraignment for shoplifting until the following week.

At some point on July 6, Rombach admitted to jail personnel that he was in withdrawal from heroin.  In a declaration, Warden Scott Adams testified that a nearby hospital "routinely explained to the jail facility . . . that there is no real treatment of withdrawal symptoms and it is sufficient for the jail to observe the inmate in withdrawal and provide plenty of hydration,

No. 20-30554

aspirin, and malox-type [*sic*] products to assist the inmate." Officers Louis Clark and Lisa Erwin echoed Warden Adams's withdrawal protocol: "The only thing we give them now is Emetrol, Imodium, and ibuprofen."

On the morning of July 9, Rombach was found dead in his jail cell. An autopsy attributed his cause of death to a perforated duodenal ulcer (i.e., a stomach ulcer). The coroner's toxicology report indicated that Rombach tested positive for amphetamine, methamphetamine, and opiates. No foul play was suspected.

## B.

Donna Rombach, on behalf of minor child D.A.R., and Rombach's estate sued BPD Chief of Police Joe Culpepper, Warden Scott Adams, Mayor of Bogalusa Wendy O'Quin Perrette, an unnamed insurance company, and unknown John and Jane Does "employed with the Bogalusa Police Department and/or the City of Bogalusa and its jail" under 42 U.S.C. § 1983 and Louisiana state law for alleged violations of Rombach's right to adequate medical care.[1] They also sued Chief Culpepper, Warden Adams, and Mayor O'Quin Perrette in their official capacities for their failure to train the overseeing correctional officers.

One day later, the Plaintiffs filed an amended complaint to correct dates alleged in the original complaint. Like the original complaint, the first amended complaint pinned the Defendants for alleged violations of federal and state law, both in their individual and official capacities.

---

[1] Hereafter, the "Plaintiffs" include Donna Rombach, on behalf of D.A.R., and Rombach's estate. The "Defendants" refer both to Chief Culpepper, Warden Adams, and Mayor O'Quin Perrette—the original parties—and the six correctional officers and the City of Bogalusa ("the City"), eventually named in the operative second amended complaint.

3

Following two years of discovery, the initial Defendants moved for summary judgment, contending they were entitled to qualified immunity on the Plaintiffs' individual capacity claims and that the official capacity claims failed as a matter of law. The same day, the Plaintiffs moved for leave to file a second amended complaint, seeking to substitute the unknown John and Jane Does with named BPD correctional officers. The Plaintiffs then responded in opposition to the motion for summary judgment.

The magistrate judge denied the Plaintiffs' motion for leave to amend without prejudice, noting that it could be re-urged if the trial was continued by the district court. Shortly thereafter, the Plaintiffs filed a motion to continue. The district court granted a continuance, permitting Plaintiffs again to seek leave to file a second amended complaint to name the individual correctional officers.

Given those rulings, the district court also denied the pending summary judgment motion without prejudice against the unnamed John and Jane Does. But the court granted summary judgment for Chief Culpepper, Warden Adams, and Mayor O'Quin Perrette and dismissed the Plaintiffs' § 1983 individual capacity claims and related state law claims against those parties with prejudice. The court denied summary judgment without prejudice as to the Plaintiffs' official capacity claims against Culpepper, Adams, and O'Quin Perrette, finding that these claims were essentially a municipal liability claim against the City under *Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978), that depended on the liability of individual correctional officers who had not yet been named in the action.

In due course, the Plaintiffs were granted leave to amend and filed their second amended complaint. As the operative pleading, the second amended complaint mirrored the first amended complaint, except that it

replaced the unknown John and Jane Does with six BPD correctional officers—Otis Taylor, Louis Clark, Lisa Erwin, Lesley Knight, Leonard Powell, and Lashonda Payton—and added the City as a defendant.

The Plaintiffs' amended pleading prompted the Defendants to file a second motion for summary judgment. There, they sought summary judgment of the Plaintiffs' § 1983 individual capacity claims against the individual officers, the § 1983 official capacity claims against Culpepper, Adams, and O'Quin Perrette (i.e., the *Monell* claim against the City), the state law negligence claims alleged against the individual officers, and the state law respondeat superior claim against the City. The district court granted the Defendants' motion, dismissing all remaining claims. The court found that (1) qualified immunity and state law immunity shielded the correctional officers from the Plaintiffs' federal and state law individual capacity claims, and (2) the Plaintiffs failed to prove that Warden Adams's drug withdrawal policy was deficient or that jail personnel violated Rombach's constitutional rights, such that Plaintiffs' *Monell* claim against the City lacked merit. The Plaintiffs appealed.

## II.

Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). In applying this familiar rule, a court "inherently makes two separate findings." *Roque v. Harvel*, 993 F.3d 325, 332 (5th Cir. 2021). First, the court determines "whether there are *genuine* fact disputes," and then, "whether those fact disputes are *material* to the outcome of the case." *Id.* (emphases added). The doctrine of qualified immunity "alters the usual summary judgment burden of proof." *Valderas v. City of Lubbock*, 937 F.3d 384, 389 (5th Cir. 2019) (per curiam), *cert. denied*, 140 S. Ct. 454 (2019). Once the defense is properly

invoked, the burden shifts to the plaintiff to rebut it. *Vincent v. City of Sulphur*, 805 F.3d 543, 547 (5th Cir. 2015). All facts and inferences are still construed in the light most favorable to the nonmovant. *Poole v. City of Shreveport*, 691 F.3d 624, 627 (5th Cir. 2012).

Because this appeal arises from a final judgment, we review the district court's determinations regarding qualified immunity and summary judgment de novo, applying the "same standard as the district court." *Renfroe v. Parker*, 974 F.3d 594, 599 (5th Cir. 2020) (citations omitted), *cert. denied*, No. 20-1269, 2021 WL 1520838 (U.S. Apr. 19, 2021).[2] Even where we may depart from the district court's reasoning, "[we] may affirm the district court on any grounds supported by the record and argued in the court below." *Williams v. Banks*, 956 F.3d 808, 811 (5th Cir. 2020) (alteration in original) (citation omitted).

## III.

The Plaintiffs challenge the district court's entry of summary judgment on several grounds. First, we address whether the doctrine of qualified immunity shields the correctional officers from suit in their individual capacities. After, we transition to the Plaintiffs' municipal liability claim against the City (i.e., the official capacity claims against Culpepper, Adams, and O'Quin Perrette). And we end our discussion by reviewing dismissal of the Plaintiffs' state law claims.[3]

---

[2] *Compare Renfroe*, 974 F.3d at 599 (reviewing qualified immunity appeal from final judgment using "same standard as the district court" (citations omitted)), *with Roque*, 993 F.3d at 332 (reviewing a qualified immunity interlocutory appeal for challenges to the materiality of the fact issues but lacking jurisdiction to review the genuineness of the fact issues), *and Melton v. Phillips*, 875 F.3d 256, 261 (5th Cir. 2017) (en banc) (same).

[3] The Plaintiffs do not appear to challenge the district court's conclusion that qualified immunity applies to Chief Culpepper, Warden Adams, and Mayor O'Quin Perrette in their individual capacities. To the extent that the Plaintiffs do not concede this

No. 20-30554

## A.

Qualified immunity protects government officials from civil liability if "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Its aim is to harmonize "the need to hold public officials accountable when they exercise power irresponsibly" with "the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Id.* The defense "protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

Two inquiries ensure its aim. First, a plaintiff must show an actor violated a constitutional right; second, the plaintiff must prove that the violated right was clearly established at the time of the alleged misconduct. *Pearson*, 555 U.S. at 232; *Morrow v. Meachum*, 917 F.3d 870, 874 (5th Cir. 2019). "We can decide one question or both" in reviewing a judgment based on qualified immunity, *Morrow*, 917 F.3d at 874; in this case, we discuss both inquiries.[4]

---

issue, the district court properly granted summary judgment as to these claims based on qualified immunity. We see no evidence in the record sufficient to impute to the officials the knowledge that Rombach was exposed to a substantial risk of harm. *See Gobert v. Caldwell*, 463 F.3d 339, 345–46 (5th Cir. 2006).

[4] Before *Pearson*, the Court in *Saucier v. Katz*, 533 U.S. 194, 201 (2001) mandated the two-step inquiry for resolving government officials' qualified immunity claims. *But see Pearson*, 555 U.S. at 236 ("Although we now hold that the *Saucier* protocol should not be regarded as mandatory in all cases, we continue to recognize that it is often beneficial."); *see also Roque*, 993 F.3d at 332 ("[W]e have repeatedly emphasized that there is value in addressing both questions 'to develop robust case law on the scope of constitutional rights.'" (quoting *Joseph v. Bartlett*, 981 F.3d 319, 331 n.40 (5th Cir. 2020))).

**1.**

First, we determine whether the Plaintiffs have shown facts that "make out a violation of a constitutional right." *Pearson*, 555 U.S. at 232 (citing FED. R. CIV. P. 50, 56); *see also Hope v. Pelzer*, 536 U.S. 730, 736 (2002). Under the Eighth Amendment, "[t]he unnecessary and wanton infliction of pain . . . constitutes cruel and unusual punishment[.]" *Hope*, 536 U.S. at 737 (citation omitted). Inadequate inmate medical care may rise to an Eighth Amendment violation, but for it to do so, a prison official must act with "deliberate indifference" to the "serious medical needs of prisoners." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). Since *Estelle*, the Supreme Court has clarified that a prison official "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists," and the official "must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *Petzold v. Rostollan*, 946 F.3d 242, 249 (5th Cir. 2019).[5] Restated, a plaintiff must prove "objective exposure to a substantial risk of serious harm," *Gobert*, 463 F.3d at 345,—that is, the existence of a serious medical need, *id.* at 349 n.30; the official's subjective knowledge of his substantial risk, *Farmer*, 511 U.S. at 837; and the official "disregard[ed] that risk by failing to take reasonable measures to abate it." *Id.*

In this case, the district court found that "there is no evidence establishing that any particular jail employee defendant knew that Rombach

---

[5] Because *Farmer* requires prison officials to have subjective knowledge of a prisoner's substantial risk of serious harm, it follows that officials accused of deliberate indifference may rebut a plaintiff's claim by showing that "they did not know of the underlying facts indicating a sufficiently substantial danger and that they were therefore unaware of a danger, or that they knew the underlying facts but believed (albeit unsoundly) that the risk to which the facts gave rise was insubstantial or nonexistent." *Farmer*, 511 U.S. at 844. "[P]rison officials who act reasonably cannot be found liable under the Cruel and Unusual Punishments Clause." *Id.* at 845.

may have been suffering from acute heroin withdrawal symptoms—much less the perforated ulcer that caused his death." The court continued: "Nor is there any evidence that any particular jail employee defendant drew the inference that Rombach had a serious medical need." Those findings are supported by the record, and we agree with the district court that the evidence is insufficient to demonstrate that the denial of medical care in this case violated the Eighth Amendment.[6]

The Plaintiffs assert that the individual officers were cognizant of Rombach's "significant symptoms" and nonetheless ignored his requests for medical attention. The Defendants counter that, although Rombach eventually notified the correctional officers that he was withdrawing from heroin, he initially denied using drugs or alcohol, and the officers were unaware of any resulting substantial risk of serious harm to Rombach. They likewise were unaware that Rombach was suffering from a perforated ulcer, which is the ailment determined to have caused his death.

We start with Officers Payton and Powell.[7] Payton worked the night shift with Officer Clark on July 8. The record evinces that she inspected the

---

[6] A state-custody convicted prisoner's constitutional rights emanate from the Eighth Amendment's guarantee against cruel and unusual punishment, *Estelle*, 429 U.S. at 104, and a pretrial detainee's rights arise from the due process guarantees of the Fourteenth Amendment. *Bell v. Wolfish*, 441 U.S. 520, 535–37 (1979). Perhaps because Rombach was imprisoned both as a pretrial detainee (as to the shoplifting charge) and post-conviction inmate (as to his failure to appear) at the time of his death, it is unclear from the parties' briefs and the record whether the Plaintiffs seek redress under the Eighth or the Fourteenth Amendment. Regardless, this court has consistently held, at least in the context of allegedly inadequate medical care, that the Eighth Amendment's subjective deliberate indifference standard applies equally to pretrial detainees traveling under the Fourteenth Amendment. *See, e.g.*, *Aguirre v. City of San Antonio*, 995 F.3d 395, 420 (5th Cir. 2021); *Hare v. City of Corinth*, 74 F.3d 633, 648–50 (5th Cir. 1996) (en banc).

[7] The Plaintiffs' briefs treat the correctional officers' actions collectively rather than individually. The Defendants first noted this mistake in their second motion for summary judgment. But the district court appears to have done the same in its second

inmates' cells at 9:00 p.m. and 10:00 p.m. that night. Yet there is no record evidence showing that Payton communicated with Rombach during his brief incarceration, that she specifically knew Rombach was suffering from heroin withdrawal (or a perforated ulcer), that she refused to treat him, or that she ignored his complaints. As to Powell, the record details even less. Taking their allegations as true, the Plaintiffs failed to establish any constitutional violation by those officers. *See Hope*, 536 U.S. at 736.

While a closer call, we reach the same conclusion regarding Officers Taylor, Clark, Erwin, and Knight. In a declaration attached to the Plaintiffs' response in opposition to the Defendants' first motion for summary judgment, another inmate, Christopher Flot, declared that he "personally heard [Rombach] tell Mr. Otis [Taylor], Mr. L[oui]s [Clark], and Ms. [Lesley] Knight that he did not feel well and [that] he wanted to go to the hospital." Flot further declared, "I personally told Mr. Otis, Mr. L[oui]s, and Ms. Knight that [Rombach] did not feel well, was not eating[,] and was vomiting[,] and he needed a doctor."

In deposition testimony, Flot provided additional details concerning Rombach's interactions with jail personnel. He stated that he heard Rombach tell Clark that "he needed to go to the hospital" on July 7. According to Flot, Rombach said, "I'm detoxing. I need to go to the hospital and get some medicine or where they can do something for me." In response, Clark allegedly "told [Rombach] he wasn't going nowhere from [t]here, he

---

summary judgment order. An officer-by-officer analysis is necessary when determining whether any officer acted with deliberate indifference to a prisoner's serious medical needs. *See Taylor v. Riojas*, 141 S. Ct. 52, 54 (2020) (per curiam); *see also Carroll v. Ellington*, 800 F.3d 154, 174 (5th Cir. 2015) ("[W]e examine each individual's entitlement to qualified immunity separately . . . ." (internal quotation marks and citation omitted)). Regardless, conducting such an analysis, we conclude that each officer is entitled to qualified immunity.

wasn't going to the doctor, he wasn't going to do nothing, he was just going to have to sit up in there and suffer." Flot testified that Rombach reiterated his distress to Clark on July 8. In the second instance, Rombach allegedly stated that he was feeling badly and that he needed medication for constipation.

Flot's testimony is at least somewhat corroborated by the record. In her deposition, Knight testified that she treated Rombach's constipation with castor oil because "[Rombach] . . . was going through withdrawals and was having trouble using the restroom." Further, Erwin explained that she moved Rombach to a padded cell because he "kept beating on the door and hollering due to heroin withdrawals." Finally, Adams attested that "Rombach admitted to the jail personnel that he was withdrawing from heroin."

Despite this evidence, we are unconvinced that the Plaintiffs have shown that any of these officers was deliberately indifferent to Rombach's medical needs. *See Williams*, 956 F.3d at 811 ("[D]eliberate indifference cannot be inferred merely from a negligent or even a grossly negligent response to a substantial risk of serious harm." (citations omitted)). Rombach completed a medical information sheet on the morning he was arrested. He stated there that he had not "recently been hospitalized or treated by a doctor"; he did not "regularly use alcohol or street drugs"; he had no "problems when [he] stop[ped] drinking or using drugs"; and he had no "other medical problems." While incarcerated, Rombach separately spoke to his father, mother, and brother on the phone. On each occasion, Rombach never conveyed that he needed medical attention or that he had requested medical care from jail personnel. Further, while the record indicates that Rombach communicated to Taylor, Clark, Erwin, and Knight that he was feeling unwell (i.e., not eating, not drinking water, constipated, and vomiting) due to his drug withdrawal, it is also unrefuted that when

officers questioned Rombach about his withdrawal symptoms while he was held in the padded cell, he told them that "he was fine" and he "requested to go back to his cell." Finally, Rombach's autopsy attributed his cause of death to a perforated stomach ulcer. Notably, it is undisputed that neither Rombach, nor his family, nor, critically, the jail personnel were aware of this condition.

Based on this summary judgment record, the correctional officers' actions do not constitute "deliberate indifference" to Rombach's "serious medical needs," *Estelle*, 429 U.S. at 104, and thus do not rise to an "unnecessary and wanton infliction of pain" cognizable under the Eighth Amendment, *Hope*, 536 U.S. at 737. Qualified immunity shields them from suit.

**2.**

Even if the Plaintiffs' allegations met the first prong of the qualified immunity analysis by showing that the officers violated Rombach's Eighth Amendment rights, the Plaintiffs would be unable to satisfy the second, that "the right at issue was 'clearly established' at the time of [Defendants'] alleged misconduct." *Pearson*, 555 U.S. at 232 (quoting *Saucier*, 533 U.S. at 201); *see also Petzold*, 946 F.3d at 255. A right is "clearly established" if the contours of that right are so "sufficiently clear" that "a reasonable official would understand what he is doing violates that right." *Hope*, 536 U.S. at 739 (citation omitted); *Mullenix*, 577 U.S. at 11; *see also Brauner v. Coody*, 793 F.3d 493, 497 (5th Cir. 2015) ("To determine that an official is *not* entitled to qualified immunity, the court must find that every reasonable officer would have understood that the alleged conduct violated a clearly established constitutional right." (emphasis in original) (citation omitted)). The chief focus of the second element of the test is "to ensure that before they are

subjected to suit, officers are on notice that their conduct is unlawful." *Hope*, 536 U.S. at 739 (citation omitted).

There are two ways a plaintiff may show that an alleged right is clearly established. First, "the plaintiff may identify a case or body of relevant case law in which an officer acting under similar circumstances was held to have violated the Constitution." *Batyukova v. Doege*, 994 F.3d 717, 726 (5th Cir. 2021) (cleaned up). "This approach 'do[es] not require a case directly on point,' but 'existing precedent must have placed the statutory or constitutional question beyond debate.'" *Id.* (alteration in original) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)). Alternatively, the plaintiff may demonstrate that "the unlawfulness of the officer's conduct is sufficiently clear even though existing precedent does not address similar circumstances." *Id.* (quoting *District of Columbia v. Wesby*, 138 S. Ct. 577, 590 (2018)). This second approach is reserved for only rare, "obvious" cases. *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004).

The Plaintiffs assert that the district court erred by determining that, even if an inmate's drug withdrawal "may be" a "serious medical need" in some cases under clearly established law, Plaintiffs failed to "present[] adequate summary-judgment evidence that any of the jail employee [D]efendants were deliberately indifferent to that need." Plaintiffs contend that instead, clearly established law required medical treatment for Rombach's symptoms. *Cf. Gobert*, 436 F.3d at 345 n.12 ("A serious medical need is one for which treatment has been recommended or for which the need is so apparent that even laymen would recognize that care is required." (citation omitted)). In support of their proposition, the Plaintiffs point to *Quatroy v. Jefferson Parish Sheriff's Office*, Nos. 04-451, 04-1425, 2009 WL 1380196 (E.D. La. May 14, 2009), and *Thompson v. Upshur County*, 245 F.3d 447 (5th Cir. 2001).

In *Quatroy*, the district court recognized that the plaintiff's drug withdrawal constituted a serious medical need because the symptoms that caused his death "were obviously serious" (i.e., "multiple seizures," "vomit[ing] blood multiple times," and "defecat[ing] on himself"). *Quatroy*, 2009 WL 1380196, at *9. Somewhat similarly, this court held in *Thompson* that "delirium tremens" (i.e., severe alcohol withdrawal) constituted a "serious medical need" under clearly established law. 245 F.3d at 457–58 (collecting cases).

We are unpersuaded, however, that *Quatroy* and *Thompson* compel this court to presume that drug withdrawal constitutes a serious medical need *in every case*. *Cf. City & Cnty. of S.F. v. Sheehan*, 575 U.S. 600, 613 (2015) ("Qualified immunity is no immunity at all if 'clearly established' law can simply be defined as the right to be free from unreasonable searches and seizures."). In fact, the Supreme Court has counseled this court against drawing such a general line. *See al-Kidd*, 563 U.S. at 742 ("We have repeatedly told courts . . . not to define clearly established law at a high level of generality."). Instead, "[t]he dispositive question is whether the violative nature of *particular* conduct is clearly established." *Mullenix*, 577 U.S. at 12 (emphasis in original) (internal quotation marks and citation omitted).

Notwithstanding, the Plaintiffs contend that the officers' actions were objectively unreasonable in light of clearly established law. For support, the Plaintiffs rely on *Thompson* and point to *Rodrigue v. Grayson*, 557 F. App'x 341, 342 (5th Cir. 2014). As noted, the *Thompson* court evaluated whether prison officials' delay and inaction toward an inmate's severe alcohol withdrawal violated clearly established law. 245 F.3d at 459. As to one officer, specifically, the court recounted her awareness and response to Thompson's withdrawal symptoms. *See id.* at 463–64. The main point was that the officer knew Thompson was severely intoxicated at the time of arrest (i.e., a 0.348% blood alcohol level); he was also "shaking, sweating profusely,

and hallucinating" while incarcerated: "Specifically, Thompson saw snakes coming out of the walls, requested a screwdriver so he could build a house, and believed he was at a barbeque in Gladewater, Texas." *Id*. at 452–454, 463–64. Thompson's condition caused him to injure himself in his cell. *Id*. at 454, 463. Given those facts, this court denied the officer qualified immunity because "all reasonable jailers would have recognized the constitutional obligation to summon medical assistance well before Thompson died[.]" *Id*. at 464.

In *Rodrigue*, a non-precedential case, an inmate incarcerated in state custody lodged five verbal or written requests for emergency medical services. 557 F. App'x at 342. In his requests, Rodrigue repeatedly complained of abdominal pain, vomiting, nausea, and constipation-like symptoms. *Id*. On each occasion, the nurse employed at the detention center visited with Rodrigue and treated him with over-the-counter medication. *Id*. On the eleventh day, with his pains persisting, the nurse authorized Rodrigue's transportation to the local hospital, where Rodrigue was diagnosed with a "ruptured or perforated appendix." *Id*.

Following recovery, Rodrigue filed a civil rights suit against the attending nurse and a correctional officer. *Id*. at 342–43. The district court denied the defendants qualified immunity, and this court affirmed. *Id*. at 343, 346. In sum, we held that the defendants knew of Rodrigue's serious medical condition, yet ignored it: "[T]he continuous and intense nature of Rodrigue's complaints of vomiting and abdominal pain were simply ignored[,]" and "[a]ny reasonable person in [the defendants'] position would have known that ignoring Rodrigue's complaints in light of his medical situation would be a violation of his rights under the Eighth Amendment." *Id*. at 347.

But *Thompson* and *Rodrigue* are easily distinguishable from the present case. Neither confronts an inmate suffering from heroin withdrawal coupled with an undiscovered perforated stomach ulcer. The inmates' conditions in *Thompson* and *Rodrigue* were continuous, acute, and observed. By contrast, there is no specific evidence showing that any officer witnessed Rombach vomiting or struggling to eat. Additionally, Rombach was neither hallucinating, nor seizing, nor injuring himself. *Cf. Thompson*, 245 F.3d at 452–54. Moreover, the relevant time frame in the present case spanned roughly seventy-two hours. *Cf. Rodrigue*, 557 F. App'x at 342. In that time, it is alleged Rombach verbally requested medical attention twice. However, the record also includes unrefuted testimony that when officers questioned Rombach about his drug withdrawal, he replied that "he was fine." And Rombach stated on his intake forms that he was not using alcohol or drugs, he was not in withdrawal, and he did not need medical attention. He also did not appear intoxicated or under the influence at the time of his arrest, and the record supports that the officers followed the local hospital's advice concerning proper treatment of withdrawal symptoms.

"[W]hen the defendant moves for summary judgment based on qualified immunity, it is the plaintiff's burden to demonstrate that all reasonable officials similarly situated would have then known that the alleged acts of the defendants violated the United States Constitution." *Thompson*, 245 F.3d at 459–60 (citation omitted). Given the materially unrefuted evidence, we cannot conclude that, in the light of clearly established law, every reasonable correctional officer would have summoned medical assistance before Rombach's death.[8] Therefore, we affirm the district

---

[8] Our conclusion holds irrespective of whether medical assistance for heroin withdrawal would have (or would not have) discovered Rombach's perforated stomach ulcer.

court's grant of qualified immunity, and thus summary judgment, in favor of Taylor, Clark, Knight, Erwin, Powell, and Payton.

## B.

The Plaintiffs next challenge the City's policy for treating inmates in withdrawal. The district court concluded that the Plaintiffs failed to prove that the policy was deficient or that an underlying constitutional violation occurred. We agree and affirm the district court on this issue.

A plaintiff can hold a municipality liable for violating a person's constitutional rights under § 1983. *See Monell*, 436 U.S. at 690. To do so, a plaintiff must prove three elements: a policymaker; an official policy or custom; and a violation of constitutional rights whose moving force is the policy or custom. *See Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001) (citing *Monell*, 436 U.S. at 694). These elements exist "to prevent a collapse of the municipal liability inquiry into a respondeat superior analysis." *Zarnow v. City of Wichita Falls*, 614 F.3d 161, 167 (5th Cir. 2010).

Assuming *arguendo* that the Plaintiffs identified the proper policymaker (Warden Adams) and demonstrated that the withdrawal protocol—"over-the-counter med[ications] and water as opposed to providing access to actual medical care from medical professionals"—was in fact the jail's official policy or custom for treating inmates in withdrawal, the third element nonetheless proves fatal to the Plaintiffs' *Monell* claim. "To hold a municipality accountable for a violation of constitutional rights, a plaintiff must show: (1) that the municipal employee[s] violated his clearly established constitutional rights with subjective deliberate indifference; and (2) that this violation resulted from a municipal policy or custom adopted and maintained with objective deliberate indifference." *Olabisiomotosho v. City of Houston*, 185 F.3d 521, 528–29 (5th Cir. 1999). As discussed above, the officers did not violate any clearly established Eighth Amendment rights, and

the summary judgment evidence fails to establish that the alleged policy was adopted or maintained with objective indifference. Consequently, the Plaintiffs' official capacity claims against the Defendants (i.e., the *Monell* claim against the City) fail, and summary judgment was proper.

## C.

Finally, Plaintiffs challenge the district court's dismissal of their state law negligence claims against Chief Culpepper, Warden Adams, Mayor O'Quin Perrette, and the six correctional officers. The Plaintiffs also contend the district court erred by dismissing their state law respondeat superior claims against the City, Culpepper, Adams, and O'Quin Perrette. We affirm the district court in all respects.

### 1.

The Plaintiffs' state law negligence claims center on the Defendants' alleged liability under Louisiana Civil Code articles 2315, 2315.1, and 2316. The district court held that Culpepper, Adams, O'Quin Perrette, and the individual officers were shielded from the these claims under Louisiana's qualified immunity protections. *See* LA. STAT. ANN. § 9:2798.1. We agree.

The relevant Louisiana statute provides:

A. As used in this Section, "public entity" means and includes the state and any of its branches, departments, offices, agencies, boards, commissions, instrumentalities, officers, officials, employees, and political subdivisions and the departments, offices, agencies, boards, commissions, instrumentalities, officers, officials, and employees of such political subdivisions.

B. Liability shall not be imposed on public entities or their officers or employees based upon the exercise or performance or the failure to exercise or perform their policymaking or

discretionary acts when such acts are within the course and scope of their lawful powers and duties.

C. The provisions of Subsection B of this Section are not applicable:

(1) To acts or omissions which are not reasonably related to the legitimate governmental objective for which the policymaking or discretionary power exists; or

(2) To acts or omissions which constitute criminal, fraudulent, malicious, intentional, willful, outrageous, reckless, or flagrant misconduct.

*Id.* According to the Louisiana Supreme Court, this statute is "clear and unambiguous," and it immunizes public entities and their officers and employees from tort claims based on "policymaking or discretionary acts when such acts are within the course and scope of . . . lawful powers and duties." *Gregor v. Argenot Great Cent. Ins. Co.*, 2002-1138, p. 12 (La. 5/20/03), 851 So. 2d 959, 967; *see also Dominique v. Parish*, 2019-0452, p. 10 (La. App. 1 Cir. 9/16/20), 313 So. 3d 307, 314 ("Specifically, under [this statute], public entities, including sheriffs and sheriff's deputies, are immune from tort claims based on their policy-making decisions or discretionary acts carried out within the course and scope of their employment." (citation omitted)); *cf.* La. Stat. Ann. § 9:2798.1(C)(2) (foreclosing immunity for defendants whose acts or omissions "constitute criminal, fraudulent, malicious, intentional, willful, outrageous, reckless, or flagrant misconduct"). Whether the conduct at issue falls within the general protections of the statute or is proscribed by the statute's exceptions "is purely a question of law[] and is within the province of the trial court to determine at the summary judgment stage." *Simmons v. Hughes*, 2019-1389, p. 13 (La. App. 1 Cir. 11/25/20), No. 2019-CA-1389, 2020 WL 6948991, at *6 (citations omitted), *reh'g denied* (Jan. 4, 2021).

No. 20-30554

The general rule applies to Culpepper, Adams, and O'Quin Perrette. The record is devoid of any evidence demonstrating that those officials were personally involved in any decisions surrounding Rombach's medical care, albeit the evidence supports that Adams, as Warden, may have instituted a medical care policy or custom at the city jail. Adams's decisions in that regard, however, fit squarely within the type of discretionary conduct that is protected by Louisiana's qualified immunity statute. Further, the Plaintiffs have failed to present any genuine issue of material fact purporting to show that the establishment of any jail policy as to inmate medical care originated from "criminal, fraudulent, malicious, intentional, willful, outrageous, reckless, or flagrant misconduct." La. Stat. Ann. § 9:2798.1(C)(2). We therefore affirm the district court's dismissal of Plaintiffs' state law negligence claims against Culpepper, Adams, and O'Quin Perrette.

Turning to the individual correctional officers, the Plaintiffs assert that because "medical [c]are is an obligation [under state law] and is not a discretionary function," the qualified immunity statute cannot apply. We disagree. In *Aucoin v. Larpenter*, a state appellate court recently explained that, although state law mandates the appointment of a physician or healthcare provider to provide healthcare services to incarcerated persons, and state law dictates minimum jail healthcare standards, the care administered and provided to prisoners "involve[s] discretion." 2020-0792, p. 14 (La. App. 1 Cir. 4/16/21), No. 2020-CA-792, 2021 WL 1440202, at *9. Analogously, although the individual officers in this case were allegedly guided by at least a *de facto* policy or custom, the officers' decisions to provide (or not to provide) certain care to Rombach were ultimately the result of their discretion. *See id.*; *see also Dominique*, 313 So. 3d at 316 ("There is a presumption that when government employees exercise discretion given to them by a statute or regulation, they are doing so based on the same policy concerns that animate the controlling statute or regulation itself." (citation

omitted)).  It therefore follows that the individual officers are protected by Louisiana's qualified immunity statute.

The Plaintiffs next contend that "the testimony of Mr. Flot, in which he testified Mr. Rombach was told 'he was just going to have to sit up there and suffer' raises questions of fact as to whether the actions of the [Defendants] were acts or omissions" under Subsection (C)(2).  Again, we disagree.  *Cf. Simmons*, 2020 WL 6948991, at *10 (finding, in the context of excessive force, no genuine issue of material fact regarding whether the defendants' actions constituted misconduct under Subsection (C)(2) because defendants "gain[ed] knowledge after-the-fact of plaintiff's diabetic condition and that a diabetic episode was the likely explanation of his erratic actions").  As we have discussed, the evidence here does not indicate that any of the officers' actions constituted "criminal, fraudulent, malicious, intentional, willful, outrageous, reckless, or flagrant misconduct" sufficient to revoke immunity under § 9:2798.1(C)(2).[9]  The district court's summary judgment on the state law claims against these Defendants is affirmed.

**2.**

Lastly, the Plaintiffs attempt to utilize the theory of respondeat superior under Louisiana Civil Code article 2320 to establish liability on the part of the City, Culpepper, Adams, and O'Quin Perrette for the correctional officers' allegedly negligent actions in providing medical care and maintaining a *de facto* policy of inadequate treatment.  The statute states that "[m]asters and employers are answerable for the damage occasioned by their

---

[9] Even if Flot's declaration was sufficient to create a genuine dispute of fact as to whether any of the officers' conduct fell outside Louisiana's qualified immunity protections, it would create such an issue only for Officer Clark; there is no evidence connecting the other officers to Clark's particular statements alleged in Flot's testimony.

servants and overseers, in the exercise of the functions in which they are employed." LA. CIV. CODE ANN. art. 2320.

In dismissing this claim against Culpepper, Adams, and O'Quin Perrette, the district court held that "[w]hile vicarious liability under a respondeat superior theory is potentially viable under state law, the liable party is the State, not the tortfeasor's supervisors." On appeal, the Plaintiffs' challenge to the district court's conclusion consists of nothing more than conclusory allegations insufficient to defeat summary judgment. In their briefs, the Plaintiffs do not offer any argument or authority to support their contention that the district court erred. *See* FED. R. APP. P. 28(a)(8)(A). We are therefore unpersuaded that the district court erred in dismissing the respondeat superior claims against Culpepper, Adams, and O'Quin Perrette.

And because we conclude the claims alleged against the officers fail, it follows that the Plaintiffs' respondeat superior claim against the City also fails. The district court's dismissal of Plaintiffs' state law claims is affirmed.

## IV.

In sum, we AFFIRM the district court's dismissal of (1) the Plaintiffs' § 1983 claims against Culpepper, Adams, O'Quin Perrette, and the six correctional officers in their individual capacities; (2) the Plaintiffs' § 1983 official capacity claims against Culpepper, Adams, O'Quin Perrette, and the officers (i.e., the *Monell* claim against the City); (3) the Plaintiffs' state law negligence claims against Culpepper, Adams, O'Quin Perrette, and the officers in their individual capacities; and (4) the Plaintiffs' state law respondeat superior claims against Culpepper, Adams, and O'Quin Perrette in their official capacities, and against the City.

AFFIRMED.